IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GARY EDGAR,

                            Plaintiff,

          v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                        Defendant.

OPINION AND ORDER

09-cv-264-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Three and a half years ago, this court reversed a decision by the Commissioner of Social Security denying benefits to plaintiff Gary Edgar, on the ground that the administrative law judge failed to make clear in his decision how he had accounted for evidence in the record that showed that plaintiff had difficulties concentrating, processing verbal information and interacting with others. Edgar v. Barnhart, 04-cv-820-bbc, Order, June 17, 2005, dkt. #12 (adopting report and recommendation entered June 17, 2005, dkt. #11). On remand, after taking additional evidence, the same administrative law judge again denied benefits. Plaintiff appeals, arguing that the administrative law judge failed again to account for all of his documented limitations in finding him not disabled. I agree. As in his

1

first decision, the administrative law judge did not build and adequate bridge between the evidence and his findings regarding plaintiff's mental limitations. Accordingly, I am remanding this case to the commissioner for further proceedings.

The facts below are drawn from the administrative record (AR). Because only plaintiff's mental impairments were at issue in the proceedings after remand, few facts are included relating to plaintiff's physical impairments. Edgar v. Barnhart, 04-cv-820-bbc, Rep. and Rec., dkt. #11, at 2, 18 (affirming decision with respect to physical limitations). Some of these facts are taken verbatim from Magistrate Judge Crocker's report and recommendation in Edgar v. Barnhart, 04-C-820-C.


FACTS

A.  Background and Original Administrative Proceedings

Plaintiff was born on July 27, 1965. He has a general equivalency diploma. AR 605. Plaintiff performed a number of unskilled jobs for brief periods in the past. AR 605, 1108-14. Most recently, he worked seasonally as a hand packager for a mail order company.

In October 2000, at the age of 35, plaintiff had a massive heart attack requiring five-vessel heart bypass surgery. He was hospitalized again in January 2001 for chest pain; cardiac catheterization revealed that two of his vessels had collapsed. After his second surgery, he was diagnosed with anxiety and depression. In January 2001, plaintiff filed his

2

first application for social security benefits.  (Since then, he has filed numerous additional applications.)  This case concerns the applications for supplemental security income and disability insurance benefits that plaintiff filed on December 27, 2001 and January 22, 2002. After the local disability agency denied the applications, plaintiff had a hearing before an administrative law judge, who issued an unfavorable decision on March 14, 2003, 17 days before plaintiff's eligibility for disability insurance benefits expired.

As of March 2003, the record before the administrative law judge included a number of medical and non-medical records and reports addressing plaintiff's mental limitations. Plaintiff's treating physician, Dr. Ness, described plaintiff in July 2001 as having a "minimal" ability to relate to others and some difficulty with concentration and comprehension, although he had logical thought processes and good recall of recent and remote events.  AR 192-94.  Roger Rattan, a state agency consulting psychologist, determined from his review of the record in August 2001 that although plaintiff had a number of "moderate" mental limitations and a "marked" limitation in his ability to interact appropriately with the general public, he should be capable of performing repetitive, low stress work that did not require frequent contact with other people.  AR 205.

The most detailed overview of plaintiff's mental condition was provided by psychologist Peter Koehn, Ph.D., who evaluated plaintiff in May 2002.  Koehn diagnosed an anxiety disorder and assigned plaintiff a score of 45 on the Global Assessment of

3

Functioning Scale.  He summarized his conclusions as follows:

> [T]his is an individual who is currently experiencing significant problems with his cognitive processing, along with a history of depressed mood and deficits in his interpersonal functioning. He had consistent difficulty formulating response to verbal questions and recalling even basic background information was a struggle for him.  His ability to concentrate and provide consistent information appeared to be seriously impaired during the evaluation.   The client's depressed mood is likely contributing to his cognitive and memory deficits.  While he is experiencing significant worries related to his physical health, evidence indicates that his other anxiety symptoms are being effectively treated through his medication.  His social isolation and possible learned helplessness (in the face of his heart condition) are likely contributing to his mood problems.

AR 328.

> Discussing plaintiff's capacity for work, Dr. Koehn wrote:

> With regard to cognitive and memory skills, the client is impaired in terms of his ability to carry out mental tasks in a timely manner.  If employed in a setting where he has minimal contact with other people, and with few time constraints, it is possible that he could be effective in his job.  His principal difficulty is likely to be his very slow processing of verbal information and stress brought about by his desire to avoid other people.  He would also not be well-suited to any position that involved physical labor, as such jobs would involve tasks that could exacerbate stamina deficits (and worries) related to his heart condition.

Id.

In the March 14, 2003 decision, the administrative law judge found that plaintiff had

4

the severe impairments of an anxiety disorder and residuals of five-vessel bypass surgery, but that his impairments did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.  Assessing plaintiff's residual functional capacity, he found that plaintiff could perform light work not requiring exposure to environmental contaminants and that he had a limited but satisfactory ability to relate to the public and coworkers, perform tasks requiring attention and concentration, demonstrate reliability and engage in work requiring that he understand, remember and carry out detailed instructions. On the basis of vocational expert testimony adduced at the hearing, the administrative law judge concluded at step four that plaintiff could perform his past relevant work as a production and assembly worker.  Alternatively, he found, plaintiff could make a vocational adjustment to a significant number of jobs existing in the regional economy, namely, 2,400 marker jobs, 13,000 inspecting/packaging jobs and 2,400 rag sorting jobs.

## B.  The Court's 2005 Decision

After the Appeals Council denied plaintiff's request for review, plaintiff brought suit in this court under 42 U.S.C. § 405(g).  In a report issued May 31, 2005, the magistrate judge recommended rejection of plaintiff's challenges to the administrative law judge's findings regarding plaintiff's physical impairments and their affect on his ability to work, finding that substantial evidence in the record supported the administrative law judge's

5

conclusion that plaintiff could perform light work.  With respect to plaintiff's mental impairments, however, the magistrate judge recommended that the case be remanded to the commissioner for further proceedings.  In particular, the magistrate judge found that it was "unclear whether the administrative law judge (ALJ) considered substantial evidence in the record showing plaintiff's difficulties concentrating, processing verbal information and interacting with others."  Edgar v. Barnhart, 04-cv-820-bbc, Rep. and Rec., dkt. #11, at 1. Explaining the reasons for this recommendation, the magistrate judge wrote:

> Having carefully reviewed the record, I am unable to determine whether the ALJ's assessment of plaintiff's residual functional capacity adequately considered all of plaintiff's mental limitations.  For example, although the ALJ discussed Dr. Koehn's report in his decision, he did not mention Dr. Koehn's finding that plaintiff was impaired in his ability to concentrate and process verbal information.  It is clear that the ALJ was not persuaded that plaintiff had significant *memory* problems, as Dr. Koehn had found:  the ALJ pointed out more than once that Dr. Ness had found plaintiff to have "good recall of recent and remote memories."  However, the ability to remember things is not the same as the ability to concentrate.  The ALJ also noted accurately that plaintiff's panic attacks were well-controlled on Zoloft and that plaintiff was "able to organize himself extremely well in his various letters arguing for disability."  AR 18.  But again, neither of these facts are inconsistent with Dr. Koehn's conclusion that plaintiff has significant cognitive deficits.  A careful reading of Dr. Koehn's report shows that plaintiff's difficulties in processing information were separate from his anxiety symptoms and were present in spite of Zoloft's other benefits.  And plaintiff's ability to present himself well in his written communications proves nothing absent some indication how long it took plaintiff to prepare those documents.

> The ALJ also gave short shrift to the substantial evidence in the record indicating that plaintiff was significantly impaired in his ability to relate to others.  Dr. Koehn described plaintiff as having "significant difficulties"

6

relating to others, and reported that stress produced by plaintiff's desire to avoid others at work was one of plaintiff's primary work limitations. Dr. Ness also noted that plaintiff had a "minimal" ability to relate to others. The ALJ's opinion provides no assurance that he considered this evidence. He mentioned that plaintiff's anxiety symptoms were reduced on Zoloft and that plaintiff had reported feeling less anxious while driving or out in public, but this evidence does not necessarily translate into a conclusion that plaintiff's ability to interact with others also had improved.

The ALJ did note that Dr. Koehn found that in spite of his mental limitations, plaintiff probably could perform a job that involved "minimal contact with other people and few time constraints." The commissioner asserts that this evidence shows that "given the right circumstances, [plaintiff] could be an effective worker" and therefore supports the ALJ's finding that plaintiff is not disabled. Mem. in Supp. of Comm.'s Decision, dkt. 9, at 15.

The problem with this argument is that neither the ALJ's residual functional assessment nor his hypothetical question to the vocational expert captures the "circumstances" set out by Dr. Koehn. The ALJ found that plaintiff had a "limited but satisfactory" ability to relate to the public and coworkers, perform tasks requiring attention and concentration, engage in work requiring that he remember and carry out detailed job instructions and demonstrate reliability. This RFC says nothing of limiting contact with supervisors, even though substantial evidence in the record indicates that plaintiff has difficulty accepting instructions and responding appropriately to criticism from supervisors. *See Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (RFC requiring plaintiff to have limited contact with public and coworkers inadequate because it failed to account for evidence of limitations in ability to interact with supervisors). Moreover, the RFC does not contain any finding that purports to limit plaintiff to jobs with "few time constraints." Finally, given the concentration and processing deficits identified by Dr. Koehn and observed by Drs. Ness and Tarrar, it is doubtful that plaintiff is able to understand, remember and carry out detailed job instructions, particularly in a job requiring the performance of tasks at a steady pace.

It is possible that the ALJ meant to capture all of plaintiff's cognitive and social limitations within his RFC. If that is the case, however, then the ALJ's decision fails to build an "accurate and logical bridge from the evidence

7

to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *see also Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). The ALJ addressed some of plaintiff's alleged mental limitations, but nothing in his decision makes clear how he accounted for the substantial evidence in the record indicating that plaintiff has significant limitations in his ability to concentrate, process information and relate to others, including supervisors. "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citations omitted); *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight") (citation omitted).

Id. at 20-23.

The commissioner filed no objections to the magistrate judge's recommendation. Accordingly, on June 17, 2005, I entered an order adopting the report and remanding the case to the commissioner. Id., dkt. #12.


C. Post-Remand Proceedings

1. Additional medical evidence

As directed in the remand order, the administrative law judge held another hearing, at which plaintiff was represented by a lawyer. Through counsel, plaintiff submitted evidence from Dr. D.L. Reilly, a staff psychiatrist at the Monroe Clinic who began treating

8

plaintiff a few months after the administrative law judge's first decision.  At plaintiff's first visit with Reilly on July 28, 2003, plaintiff reported avoiding social contact and having weekly panic attacks that were brought on by stress and sometimes for no reason at all.  AR 891, 1097.  He also reported occasional problems with his temper, variable moods, chronic insomnia and a history of psychotic symptoms, including incidents when he perceived voices coming from the TV when it was not on or when he thought people were trying to kill him. Reilly observed that plaintiff was alert, pleasant and well groomed and that he answered questions quite openly.  Plaintiff spoke slowly but his thoughts were well connected and goal oriented.  Plaintiff's memory and concentration appeared "at least grossly intact."  Reilly thought plaintiff might have a bipolar affective disorder with psychotic features and an anxiety disorder.  AR 892, 1098.

On August 11, 2003, plaintiff returned to see Dr. Reilly.  Plaintiff reported that he had some depression but nothing more than usual.  He had had some frightening visual hallucinations the night before, which had made him anxious.  Reilly started plaintiff on Lamictal, a mood-leveling medication.  AR 889, 1095.

On August 25, 2003, Reilly saw plaintiff, who reported that his mood had improved on the Lamictal and that he was having no side effects.  Plaintiff said his wake-sleep cycle was turned around, so that he went to bed at about 6 a.m. and slept until about 2 p.m. Plaintiff brought in typed notes identifying ways in which his symptoms were similar to

9

those of his mother, who had a dissociative disorder.  He also had typed up a statement indicating that he was disabled and unable to work and he asked Reilly to sign it.  Reilly refused but told plaintiff he would complete a request for information if he was asked to do so by the state disability agency.  He prescribed medication to help regulate plaintiff's sleep cycle.  AR 887, 1093.

Plaintiff saw Dr. Reilly again on December 16, 2003.  Plaintiff said he had not come in sooner because he had run out of his Healthcare Assurance funding.  Plaintiff was alert, cooperative and fairly groomed.  Reilly noted that plaintiff's thinking was slow as it had been during past visits.  Plaintiff volunteered little but answered questions willingly, with latency of responses.  Plaintiff reported that his sleep cycle was now normal and that he was not taking the sleep medication that Reilly had prescribed.  He was still anxious at times, reported having "memory lapses" some evenings and said his thinking did not seem clear.  He was not spending any social time but had been busy on the computer.  Plaintiff reported that he had written two books on family genealogy and a little cookbook.  Reilly wrote that although plaintiff was continuing to have some trouble with depression, he was having more symptoms that were consistent with a thought disorder.  Reilly added Seroquel, a tranquilizer, to plaintiff's medications.  AR 971-972.

Plaintiff saw Reilly again on January 20, March 8 and March 29, 2004.  On March 29, Reilly noted that plaintiff was "very, very vague" when Reilly asked him for information

about his symptoms and his medications.  Reilly indicated that plaintiff's behavior was symptomatic of either a thought disorder or was "intentional and designed to further his disability claim."  AR 966.  Plaintiff said he had had one or two panic attacks in the past week and left the house once or twice a week at most.

Reilly completed a mental residual functional capacity assessment of plaintiff.  Reilly determined that plaintiff's ability to perform the basic mental requirements of unskilled work was "fair."  The term "fair" was defined on Reilly's form as meaning "seriously limited, but not precluded."  AR 957.  With respect to some other abilities, Reilly seemed to find plaintiff more limited, because he placed a check mark on the line between "fair" and "poor to none" when rating plaintiff's ability to understand, remember and carry out detailed instructions, interact with the general public and maintain socially appropriate behavior.  AR 958.  (According to the form, these abilities are not required for the performance of unskilled work, but are required of skilled or semiskilled work or for "particular types of jobs."  AR 958.)  Reilly also indicated that plaintiff would miss more than three days of work a month. He wrote that these limitations applied as of the date he first met with plaintiff, July 28, 2003, or maybe earlier if plaintiff's self-reports could be corroborated.  AR 957-58.

Reilly saw plaintiff on May 4, July 22 and August 31, 2004.  On July 22, he noted that plaintiff was alert and fairly pleasant, although Reilly still perceived evidence of a thought disorder.

11

On November 1, 2004, Dr. Reilly saw plaintiff, who did not want any change in his medications.  Reilly noted that plaintiff was alert, pleasant and well groomed and "much as I have observed previously (i.e., he gives very vague answers to most interview questions)." AR 960.  Plaintiff had a disability hearing scheduled for later in the month. Reilly wrote, "It will be of interest to see if his apparent ability to function is altered subsequently."  AR 1085.

2.  Robert Beck, Ph.D.

Plaintiff began seeing Robert Beck, a licensed psychologist, on July 23, 2003.  AR 894.  At an office visit on July 30, Beck encouraged plaintiff to contact the Division of Vocational Rehabilitation.  Beck pointed out to plaintiff that if he could become employed, he would make more money than he would receive from social security.  AR 890,1096.  On August 12, 2003, plaintiff reported to Beck that he had contacted the Division of Vocational Rehabilitation but that it would not work out for him because he would not make as much money as he would under social security.  AR 888, 1094.

On August 26, 2003, plaintiff brought a document to Beck to explain why he thought he had a dissociative disorder.  He reported that the Lamictal was helping to level his moods somewhat. AR 886, 1092. On September 8, plaintiff saw Beck and reported he was sleeping better.  He told Beck he was placing his hopes on getting social security disability as a way

12

of improving his financial situation.  AR 885,1091.

3.  Hearing testimony

Plaintiff testified that after his cardiac problems in 2001 and 2002,  his depression was pretty bad.  AR 1115.  He said that around 1996, he stopped socializing with others for reasons that he could not explain.  He testified that he saw Dr. Reilly in 2003 for depression and because he thought he might have other mental problems, such as bipolar disorder.  AR 1117, 1119.  Plaintiff estimated that during the time period from 2000-2004, he had an average of three anxiety attacks a week and that the attacks each lasted 15 minutes.  AR 1120, 1122.  Plaintiff also testified that he had memory problems.  AR 1126.

Plaintiff's mother testified that he experienced both depression and anxiety.  She testified that he was very angry on a weekly basis and that he had limited social contacts after his heart attack.  AR 1129-30.

The administrative law judge called Richard Willette to testify as a neutral vocational expert.  Willette testified that plaintiff's past jobs included packer (light, unskilled); cleaner (light, unskilled); construction laborer (heavy, unskilled); and nurse's aide (light, unskilled). The administrative law judge asked Willette to assume an individual who could perform light work with no exposure to contaminants and who had a "limited but satisfactory" ability to relate to coworkers, deal with the public, interact with supervisors, maintain attention and

13

concentration, demonstrate reliability and deal with time constraints and deadlines.  In addition, the individual would be "seriously limited but not precluded" from understanding, remembering and carrying out detailed job instructions.  Willette testified that such an individual could perform plaintiff's past jobs of packer and nursing assistant as well as other occupations in Wisconsin.  AR 1134-36.  As examples of the other kinds of jobs that such a person could perform, Willette offered library assistant (1,760 jobs), information clerk (5,140 jobs) and office support worker (6,190 jobs).  AR 1136.

On cross-examination, plaintiff's lawyer asked Willette to assume that, instead of having a "limited but satisfactory ability" to perform the various mental tasks identified by the administrative law judge in his hypothetical, the individual was "seriously limited but not precluded" from performing those tasks.  When asked what effect those limitations would have on the ability to work competitively, Willette responded:

> The effect that any of those situations would have at that—on employment would be that the individual would probably run up against disciplinary action, depending how serious each one of those factors affected performance as to quality of work, quantity of time to do the work.  He would probably be terminated if they became issues.

AR 1138.  Also, he testified that if the individual's demonstration of anger in the workplace became an issue, the individual would not be able to sustain competitive employment.  AR 1137-38.

14

4.  The administrative law judge's decision

On December 14, 2006, the administrative law judge issued a decision finding plaintiff not disabled.  AR 597-606.  He discussed the treatment notes from Dr. Reilly and Beck in some detail, noting that Beck had encouraged plaintiff "to think in terms of employment" rather than disability and that Reilly had questioned whether plaintiff's alleged inability to function would be different after his disability hearing.  The administrative law judge also questioned whether Reilly's opinion was even material to the applications before him, insofar as it addressed a time period later than the one under consideration. (The administrative law judge noted, erroneously, that there was a gap in Reilly's treatment notes from July 2003 until November 2004.  In fact, the record contains notes from Reilly on August 11, August 25 and December 16, 2003 and on January 20, March 8, March 29, May 4, July 22 and August 32, 2004.  AR 961-72.).   Nonetheless, the administrative law judge found that Reilly's report showed that plaintiff had "at least fair abilities to perform work activities such as concentration, processing of verbal information, and interacting with others," which were the functional areas of concern to the court.  AR 601.  As for Dr. Koehn, the administrative law judge reiterated that Koehn had stated that plaintiff "could work effectively in a job involving limited contact with people and a few time constraints."  AR 602.

Proceeding through the commissioner's five-step sequential process for evaluating

15

disability claims, 20 C.F.R. § 404.1520, the administrative law judge found that although plaintiff's anxiety disorder and residuals of five vessel bypass surgery were severe impairments, they did not meet or medically equal any of the impairments the commissioner has found to be presumptively disabling.  Moving on to the question whether plaintiff could return to his past relevant work (step four), the administrative law judge assessed plaintiff's residual functional capacity, making findings that mirrored those he had presented in his hypothetical to Willette.  With respect to mental limitations, the administrative law judge found that plaintiff had a "limited but satisfactory" ability to perform the following:

> relate to coworkers;
>
> deal with the public;
>
> interact with supervisors;
>
> maintain attention and concentration;
>
> demonstrate reliability; and
>
> deal with time constraints and deadlines.

In addition, he found that plaintiff was "seriously limited but not precluded" from understanding, remembering and carrying out detailed job instructions.

In determining plaintiff's residual functional capacity, the administrative law judge concluded that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not fully credible.  AR 603.  He noted that several of plaintiff's

16

allegations regarding his physical symptoms were not corroborated by the evidence, that Drs. Reilly, Koehn and Beck had expressed some doubt regarding plaintiff's disability and that plaintiff was able to write books on genealogy and cooking, as well as extensive and detailed papers cogently arguing the reasons why he should be considered unable to work.

The administrative law judge noted that, according to Willette, several of plaintiff's past jobs "may well be within his capacity." AR 605.  However, because it was unclear from plaintiff's limited earning history whether he had performed any of his past jobs at a substantial gainful activity level, the administrative law judge found that plaintiff could not perform any of his past relevant work.  20 C.F.R. § 404.1565(a) (past work relevant if "done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity").  At the final step of the analysis, the administrative law judge relied on Willette's testimony and found that given his age, education and residual functional capacity, plaintiff was capable of performing jobs existing in significant numbers in the regional economy, including 1,760 library assistant jobs, 5,140 information clerking jobs and 6,190 office support jobs.

The Appeals Council subsequently denied plaintiff's request for review, making the administrative law judge's decision the final decision of the commissioner.

17

OPINION

The standard by which a federal court reviews a final decision by the commissioner is well settled: the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner. Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993). Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, id., and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002). When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion. Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009); Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

The administrative law judge did not build this bridge. It is true that he addressed

18

the areas this court identified in the remand order and mentioned the various opinions in the record regarding plaintiff's abilities.   However, the residual functional capacity assessment must include a narrative discussion describing how the evidence, both objective and subjective, supports each conclusion.  SSR 96-8p.  "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p.  As in his first decision, the administrative law judge never said how much weight he was affording the various medical opinions or how he reached the conclusion that plaintiff's mental abilities in most areas were "limited but satisfactory."  This was a significant omission, for if Dr. Reilly is to be believed, plaintiff was more severely limited than the administrative law judge found.  Reilly found plaintiff to be "seriously limited but not precluded" from meeting the demands of unskilled work and even more limited in certain areas; the administrative law judge found that plaintiff's abilities were "limited but satisfactory."

Unfortunately, it is impossible to tell whether the administrative law judge deviated intentionally from Reilly's assessment or whether he simply misinterpreted it.  On the one hand, the administrative law judge suggested that Reilly's opinion was entitled to limited weight, pointing out that both Reilly and Beck, the psychologist, questioned whether

19

plaintiff was as limited as he claimed to be.[1]  On the other hand, he appears to have credited Reilly's opinion, insofar as he noted that it addressed the areas of functioning with which this court was concerned and showed that plaintiff had a "fair ability to perform all mental requirements of work."

In either case, the administrative law judge erred.  As plaintiff's treating physician, Reilly's opinion was entitled to controlling weight if it was well supported by medically acceptable clinical techniques and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d).  If the administrative law judge did not assign controlling weight to Reilly's opinion, then he was required to say how much weight he was giving it and to provide "good reasons" for that weight.  Id.; Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007).  The administrative law judge's decision provides no assurance that he followed this regulation with respect to Reilly's opinion.  He never indicated whether he found Reilly's opinion to be well supported by acceptable clinical techniques or consistent with the other evidence in the record, and he did not mention any of the other § 404.1527(d) factors,

---

[1]The administrative law judge also noted that Reilly's report was "in a sense" immaterial because it related to a time period not under consideration.  However, he also found that plaintiff was not disabled from his alleged onset date (October 2000) "through the date of this decision," which was rendered on December 14, 2006. AR 606.  Assuming this latter statement is accurate regarding the time period under consideration (2000 to 2006), then Reilly's report addressed plaintiff's condition during that time frame and would have been material.  Accordingly, I find that the administrative law judge did not reject Reilly's report on materiality grounds.

such as Reilly's specialty or the length of his relationship with plaintiff.

If, the administrative law judge did assign controlling weight to Reilly's opinion, then he erred by adopting a definition of the term "fair" that was less restrictive than that adopted by Reilly.   Arguably, this discrepancy could fall into the category of harmless error, depending upon how one reads the vocational expert's testimony.   When asked hypothetically what vocational effect would result if the severity of all of plaintiff's limitations was increased from "limited but satisfactory" to "seriously limited but not precluded," the vocational expert said that the individual would probably run up against disciplinary action.   However, he qualified that answer by stating that it depended upon how serious the various problems were.   In light of this qualification, the vocational expert's testimony does not necessarily prove that plaintiff would be unable to work if the administrative law judge had adopted Reilly's more restrictive definition of the term "fair," although it does suggest that plaintiff's ability to maintain competitive employment would be significantly at risk.

In any event, the administrative law judge's finding of greater abilities with respect to plaintiff's ability to meet the demands of unskilled work is not the only matter of concern. The administrative law judge also failed to mention that, with respect to certain abilities, Reilly placed a check mark on or near the line between "fair" and "poor or none," indicating that plaintiff was even more limited in these areas.   Although most of those tasks are not

21

required of unskilled work, at least two would seem to preclude the jobs identified by the vocational expert: the ability to interact appropriately with the general public and the ability to maintain socially appropriate behavior. It is difficult to imagine that a person with such limitations would be able to work as a library clerk, information clerk or office support person. Furthermore, the administrative law judge did not address Reilly's opinion that plaintiff would miss more than three days of work a month.

In addition, I am still not satisfied that the administrative law judge gave appropriate consideration to the opinions expressed by Dr. Koehn. The administrative law judge discussed Koehn's report only briefly, noting that Koehn thought that plaintiff might be exhibiting "learned helplessness" and that he could work effectively if he had limited contact with people and few time constraints. He also noted that Koehn had "expressed some doubt" regarding disability. Again, however, it is unclear how the administrative law judge accounted for the limitations found by Koehn. Koehn indicated that plaintiff's main problems would be "his very slow processing of verbal information and stress brought about by his desire to avoid other people," yet the administrative law judge did not adopt any limitations on plaintiff's interactions with others (such as specifying that he should have minimal contact with coworkers, supervisors or the public) or on his ability to understand and carry out simple instructions. Further, the administrative law judge misstated Koehn's conclusion regarding plaintiff's employability: whereas Koehn said that it was "possible"

22

that plaintiff could work competitively if employed in a setting "where he has minimal contact with other people, and with few time constraints," the administrative law judge omitted the qualifier and wrote that Koehn "stated that [plaintiff] could work effectively in a job involving limited contact with people and a few time constraints." AR 602. Perhaps the administrative law judge addressed Koehn's opinion only briefly because he thought Koehn's opinion was trumped by Reilly's, but as I have noted, Reilly's opinion was more supportive of disability than the administrative law judge recognized. If Reilly's and Koehn's opinions are credited (as well as Dr. Ness's and Rattan's), they support more severe social restrictions than the administrative law judge found. Indeed, the vocational expert's testimony indicates that the term "limited but satisfactory" was not much of a limitation at all, insofar as all of the jobs he identified appear to require significant contact with coworkers and supervisors, and in some cases, the public.

Accordingly, because the administrative law judge's decision does not permit an informed review of the weight he gave to the medical opinions or the manner in which he arrived at plaintiff's residual functional capacity, this case must be remanded to the commissioner again. I make this decision with some hesitation, for there are ample reasons to doubt whether plaintiff is disabled. As the administrative law judge noted, Dr. Reilly and Beck expressed this doubt, with Beck encouraging plaintiff to think in terms of employment rather than disability and Reilly noting some concern that plaintiff might be malingering.

23

The administrative law judge also pointed out various reasons to question plaintiff's credibility, including the lack of evidence to support his physical complaints; the inconsistency between plaintiff's allegations of severe anxiety attacks and evidence that plaintiff's attacks were controlled on medication; plaintiff's ability to work on the computer and write books in spite of his complaints of a disassociative disorder; Dr. Koehn's remark that plaintiff was possibly exhibiting "learned helplessness;" and the fact that plaintiff had been attempting to obtain disability shortly after recovering from heart surgery even though his doctors told him he could exercise.  He also noted that the state agency physicians had found plaintiff to have no more than moderate limitations in concentration and social functioning.   All of this evidence reasonably supports the administrative law judge's conclusion that there are *some* types of jobs that plaintiff can perform and that his complaints of disabling mental limitations are not entirely credible.   Nonetheless, for the vocational expert's testimony cannot constitute substantial evidence of those jobs unless it is based upon a hypothetical question that reflects all of the limitations that are supported by medical evidence in the record.   Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002).  The administrative law judge omitted from his hypothetical limitations that he appears to have credited in his decision, namely, the limitations identified by Dr. Reilly and Dr. Koehn.

In sum, because the administrative law judge's decision fails to provide assurance that he considered and weighed all of the evidence in arriving at plaintiff's residual functional

24

capacity, this case must be remanded to the agency for further proceedings.  (Plaintiff argues that the administrative law judge erred in failing to consider witness statements that plaintiff submitted for the first time to the Appeals Council, as plaintiff argues in his brief, but I do not agree.  Eads v. Sec'y of Dept. of Health and Human Services, 983 F.2d 815, 817-18 (7th Cir. 1993) (court's review is limited to evidence that was before administrative law judge).)  I note, however, that the administrative law judge is not required to hold another hearing on remand.  Instead, he may simply issue a new decision that comports with the requirements of 20 C.F.R. § 404.1527(d) and SSR 96-8p and that allows for an informed review.  In the event the administrative law judge reaches a different conclusion about plaintiff's residual functional capacity, then he may be required to obtain additional vocational expert testimony to assess the impact of any new limitations.

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C.

25

§ 405(g) for further proceedings consistent with this opinion.

Entered this 6th day of January, 2010.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge